Kelly I. VAN METER and Lauren J. Van Meter, Plaintiffs,

v.

TOWNSHIP OF MAPLEWOOD, Defendant.

Civ. A. No. 87–4677.

United States District Court, D. New Jersey.

Oct. 13, 1988.

Schenck, Price, Smith & King by W. James MacNaughton, Morristown, N.J., for plaintiffs.

Scarpone & Edelson, P.A. by Irwin P. Burzynski, Michael Edelson, Val Mandel, Newark, N.J., for defendant.

## OPINION

DEBEVOISE, District Judge.

This case involves homeowners who installed an antenna to receive satellite television signals in contravention of a local zoning ordinance. Plaintiff homeowners claim that the ordinance is invalidated by federal law. They seek summary judgment on their claims for declaratory and injunctive relief and attorney's fees. Defendant municipality cross-moves for dismissal of plaintiffs' claims and to amend its answer to assert a defense of failure to exhaust administrative remedies.

*Background*

Plaintiffs Kelly Van Meter and his wife Lauren are residents of Maplewood, a small, suburban community in northern New Jersey. In late 1985, plaintiffs decided to purchase a satellite television receive-only antenna, known as a "TVRO" or "earth station", that would enable them to receive television signals transmitted directly from satellites and view them on a television monitor. After researching the technology and consulting with a vendor, plaintiffs purchased a TVRO "dish antenna", also known as a "parabolic antenna" because of its shallow dish shape, at a cost of $2500 installed. The plaintiffs' dish antenna is ten feet in diameter and composed primarily of black anodized wire mesh.

In December of 1987, plaintiffs' antenna vendor performed a site survey of the Van Meter property in order to determine the optimal site for the placement of the dish antenna. The results of the survey indicated that, given the characteristics of

plaintiffs' lot, the antenna would have to be mounted on the roof to enable plaintiffs to receive signals from all of the available satellite television channels.

At the time of their purchase, plaintiffs were aware of a zoning ordinance enacted by the Maplewood Township Committee (the "Committee") that governed the installation of dish antennas. The "Maplewood Dish Antennae Zoning Ordinance" (the "Ordinance") became effective June 6, 1985. Among its provisions, the Ordinance forbids the use of a dish antenna greater than six feet in height "measured at the highest point of its outer circumference or extension," requires that the dish be placed in the rear yard, establishes minimum setbacks from property lines and buildings and requires that the dish be "screened from view . . . by evergreen planting which shall be at least six feet in height at the time of planting." (A complete copy of the Ordinance is set out in the Appendix to this Opinion).

On May 24, 1986, plaintiffs wrote the township construction official seeking a variance from the Ordinance to allow them to place the antenna on their garage roof. The construction official, Robert Mittermaier, wrote the Van Meters on April 1, 1986, and informed them that the placement they proposed was "not acceptable" and denied their "application for permission" to erect a dish antenna.

Plaintiffs attempted to appeal Mittermaier's decision to the township's Board of Zoning Adjustment (the "Board"). They allege that although they complied with the procedures for appeal as explained by Mittermaier, he rejected the application because notice of publication was not timely served on the municipality. According to plaintiffs, Mittermaier, and later the mayor of the township, informed the plaintiffs that an appeal to the Board would be futile. Defendant disputes these allegations.

After learning of an order of the Federal Communications Commission ("FCC") that plaintiffs believed permitted the installation of their antenna without regard to the local Ordinance, plaintiffs installed the antenna on the roof of their house. On May

5, 1987, plaintiffs received a summons for violation of the Ordinance and were ordered to appear before the municipal court on May 19, 1987. That summons is still pending.

On November 11, 1987, plaintiffs filed this action under 42 U.S.C. sec. 1983 claiming that the Ordinance is preempted by FCC regulation and that it violates their First Amendment rights to receive satellite television signals. They seek injunctive and declaratory relief and ask for attorney's fees pursuant to 42 U.S.C. sec. 1988.

*Abstention*

■ Although not raised directly as a bar to this action by defendant, I must first address the issue of abstention. Abstention, in its various manifestations, is a prudential doctrine applied to further comity, federalism and judicial economy. In certain limited circumstances, a federal court should abstain from exercising its jurisdiction where a state proceeding involving the same dispute is pending, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Williams v. Red Bank Bo. of Educ.*, 662 F.2d 1008 (3d Cir.1981), where allowing a state court to construe its challenged statute could avoid the necessity of reaching any constitutional issue, *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), or where the issue involves a complex, comprehensive body of state regulation over an area of traditionally local interest, *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Although abstention reflects sensitivity to state sovereignty, its application is not the result of mere deference but reflects an accommodation between state and federal interests.

■ The doctrine first announced in *Younger, supra*, prevents a federal court from hearing a case involving strong and compelling state interests where a proceeding between the same parties and involving the same issues is pending in the state courts. In the present case, a summons was issued to the plaintiffs for violation of the Ordinance on May 7, 1986. While *Younger* principles might arguably require abstention in this instance, here defendant

states that "Maplewood ... has agreed to stay the prosecution of its Municipal Court complaint against Van Meter until after plaintiff's motion for summary judgment is decided." Because defendant has voluntarily submitted to the jurisdiction of this court, therefore, the values underlying *Younger* are not implicated and its prudential constraints do not apply. *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 626, 106 S.Ct. 2718, 2722, 91 L.Ed.2d 512 (1986); *Brown v. Hotel & Restaurant Employees and Bartenders Int'l Union Local 54*, 468 U.S. 491, 500 n. 9, 104 S.Ct. 3179, 3184 n. 9, 82 L.Ed.2d 373 (1984); *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 480, 97 S.Ct. 1898, 1904, 52 L.Ed.2d 513 (1977).

■ Nor does *Younger* abstention apply to any administrative remedy which may have been available to plaintiffs through the township's Board of Adjustment because no proceeding is pending before that body. Plaintiffs twice attempted to obtain a variance from the Board. Their first letter, requesting a "zoning variance hearing at the next town meeting," was treated as an "application for permission" to erect a dish antenna and "denied" by the township construction official who also informed plaintiffs of their right to appeal his decision to the Board. Plaintiff discussed the notice requirements for a hearing application before the Board with the construction official and then completed and filed an "Application for Hearing" and had a public notice of an appeal for a variance printed in the local newspaper. According to plaintiffs' certification, however, the construction official refused to accept the application because he claimed not to have received proof of publication in sufficient time. Defendant does not claim that a variance application is now pending and it is clear that the unappealed decision of a municipal administrative official is not a pending proceeding within the meaning of the *Younger* doctrine.

■ *Pullman* abstention requires a federal court to abstain when difficult and unsettled questions of state law must be resolved before a federal question can be decided. The "relevant inquiry" under the *Pullman* doctrine, as the Supreme Court observed in *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 237, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984) "is not whether there is a bare, though unlikely, possibility that state courts might render adjudication of the federal question unnecessary." Rather, the question is whether the statue is of an uncertain nature and " 'obviously susceptible of a limiting construction.' " *Id.*, quoting *Zwickler v. Koota*, 389 U.S. 241, 251 and n. 14, 88 S.Ct. 391, 397 and n. 14, 19 L.Ed.2d 444 (1967). *Pullman* abstention is inappropriate here. The language of the Ordinance is clear and unmistakable on its face and no difficult area of state law is presented for interpretation. Moreover, *Pullman* abstention is inappropriate in cases involving a claim of preemption. *Kennecott Corp. v. Smith*, 637 F.2d 181, 185 (3d Cir.1980).

*Exhaustion of Administrative Remedies*

I must next address defendant's claim that plaintiffs' complaint should be dismissed for failure to exhaust administrative remedies.

■ Exhaustion of state administrative remedies is not required before initiating an action under 42 U.S.C. sec. 1983. *Patsy v. Florida Bo. of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). A section 1983 action may be brought for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. sec. 1983. Congress legalized the reception of authorized or unencrypted satellite television signals under the Cable Communications Policy Act of 1984 (the "Cable Act"), as discussed at greater length below, and the FCC, in turn, issued the Order to minimize interference with satellite television reception. This permits plaintiffs to bring a Section 1983 action for interference with this federal scheme. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *see also, e.g., Kennecott Corp., supra*, 637 F.2d at 186 n. 5 (section 1983 action may be brought for federal statu-

tory rights protected by Williams Act); *Pietroniro v. Oceanport,* 764 F.2d 976, 980 (3d Cir.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 554 (1985) ("In the absence of a comprehensive enforcement scheme within the regulatory scheme which encompasses plaintiffs' complaint," there is a private cause of action through section 1983 to redress state's failure to provide housing relocation assistance under Housing Act of 1949 and Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970). Exhaustion of administrative remedies is therefore not a bar to this action.

■ Exhaustion of administrative remedies is further inappropriate in this instance because the administrative proceedings available to plaintiffs are not adequate forums for their federal claims and would not materially advance the resolution of this controversy. *See, e.g., Republic Indus., Inc. v. Central Pennsylvania Teamsters Pension Fund,* 693 F.2d 290, 295 (3d Cir.1982); *Cerro Metal Prods. v. Marshall,* 620 F.2d 964, 970–71 (3d Cir.1980). The Board's functions are narrowly limited to technical matters involving review of decisions of administrative officers of the Board, interpretations of zoning maps and ordinances and the granting of variances. *See* N.J.S.A. sec. 40:55D–70. Its proceedings are not bound by the rules of evidence. N.J.S.A. sec. 40:55D–10(e). Appeals from a Board decision may be taken to the municipality's governing body, in this case the township committee, only "if permitted by [township] ordinance." N.J.S.A. sec. 40:55D–17(a). Even then, appeals are limited to the Board's decisions on special use variances. *Id.; Nickerson v. Newark,* 220 N.J.Super. 284, 531 A.2d 1095 (L.Div.1987). To require exhaustion of an administrative process that is without competence to consider plaintiffs claims would merely delay the ultimate resolution of this dispute.

■ Finally, invocation of the exhaustion doctrine is also inappropriate where a federal plaintiff faces state criminal prosecution under a statute he challenges as facially invalid and where the state administrative body is without competence to resolve the claim. *Moore v. East Cleveland,* 431 U.S. 494, 497 n. 5, 97 S.Ct. 1932, 1934 n. 5, 52 L.Ed.2d 531 (1977) (plaintiff facing quasi-criminal proceeding for violation of local zoning ordinance not required to seek zoning variance).

Since I conclude that plaintiffs are not required to exhaust administrative remedies, defendant's motion to amend its answer to assert this affirmative defense is denied as futile.

*The FCC Order*

In 1984, Congress passed the Cable Communications Policy Act of 1984 (the "Act") amending the Communications Act of 1934. The main thrust of this legislation is to assure that the exploding market for cable television technology provides the widest possible diversity of information services to the public. *See* House Committee on Energy and Commerce, Cable Communications Policy Act of 1984, H.R.Rep. No. 89–934, 98th Cong., 2d Sess. 19, *reprinted in part in* 1984 U.S.Code Cong. & Admin.News 4655, 4656. Recognizing that cable suppliers often rely on encrypted satellite transmission feeds which they then distribute through the cable distribution network to home viewers, the Act also provided for stiffened penalties for unauthorized satellite video users who intercept and decode these "pirated" messages for private use. See 47 U.S.C. 605(a). This provision also contains a limited exception to liability for direct reception of unencrypted and authorized reception of encrypted satellite television transmissions. *Id.* at sec. 605(b). Congress apparently believed that unrestricted market forces embodied in the purchasing decisions made by individual consumers would be the best means of determining the viability of this information distribution technology. *See* 120 Cong.Rec. S14,286 (Oct. 11, 1984) (statement of Sen. Packwood) *reprinted in* 1984 U.S.Code Cong. & Admin.News, 4742, 4747.

Relying in part on the Cable Act's satellite television provisions, *see* 51 Fed.Reg. 5519, 5522 (1986), the FCC issued an Order entitled "Preemption of local zoning of earth stations," found at 47 C.F.R. sec.

25.104. The *Order* provides, in relevant part, that:

State and local zoning or other regulations that differentiate between satellite receive-only antennas and other types of antenna facilities are preempted unless such regulations:

(a) Have a reasonable and clearly defined health, safety or aesthetic objective; and

(b) Do not operate to impose unreasonable limitations on, or prevent, reception of satellite delivered signals by receive-only antennas or to impose costs on the users of such antennas that are excessive in light of the purchase and installation cost of the equipment.

47 C.F.R. sec. 25.104.

Plaintiffs assert that this *Order* preempts the Maplewood Ordinance.

*Preemption of the Ordinance*

██ A federal regulation may preempt state or local law if (1) the agency intended to exercise exclusive authority in the area and (2) if the agency is legally authorized to displace state or local regulation. *New York v. FCC*, —— U.S. ——, —— —— ——, 108 S.Ct. 1637, 1641–44, 100 L.Ed.2d 48 (1988). The intent of the FCC is clear on the face of the *Order* which explicitly provides that local regulation inconsistent with its requirements is preempted.

██ The second step of the *New York* test and defendant's assertion that the FCC exceeded its authority present identical inquiries. This court, however, lacks subject matter jurisdiction to consider the question. Before an FCC order is submitted to judicial review, the FCC must have been given the opportunity to reconsider its position. 47 U.S.C. sec. 405; *Peoria v. General Elec. Cablevision Corp.* 690 F.2d 116, 121 (7th Cir.1982). Although 47 U.S.C. sec. 405 specifies that a petition for reconsideration must be filed within thirty days of the Commission's decision, this provision has been interpreted merely to provide the Commission with a "fair opportunity" to

consider the issues. *Meredith Corp. v. FCC*, 809 F.2d 863 (D.C.Cir.1987); *Peoria, supra*, 690 F.2d at 119. Thus defendant may raise his arguments before the commission in a motion for a declaratory judgment, 47 C.F.R. sec. 1.2, or in a petition for repeal of the *Order*, 47 C.F.R. sec. 1.401. Judicial review may only then be sought from the Court of Appeals. 47 U.S.C. 405(a); 28 U.S.C. sec. 2342(1). In the interests of judicial economy, I will assume without deciding that the *Order* was a valid exercise of authority by the Commission and proceed on to the balance of the preemption analysis.[1]

The preemption issue presented here is unusual because the federal regulation itself establishes standards that govern whether and to what degree the local regulation is preempted.

The threshold determination under the *Order* is whether the challenged regulation differentiates between TVRO's and other types of antenna facilities. The Ordinance clearly applies to "dish antennae … or satellite receiving station[s]." Ordinance sec. 2.1. It differentiates between TVRO antennas and transmitting dish antennas by forbidding the use of the latter entirely. *Id.* at sec. 2.3. The Ordinance does not apply to UHF and VHF television, FM radio, or ham and short-wave radio antennas. Thus the Ordinance effectively discriminates between different types of antennas.

██ The *Order* next provides that in order to avoid preemption, the local regulation must have a reasonable, clearly defined health, safety or aesthetic objective. The Ordinance passes this test. Satellite dish antennas are large and rather unsightly. Although it does not state its purposes explicitly, the Ordinance is clearly an attempt to diminish the visual impact of the antennas by requiring that they be installed in the rear yard and, where they can be viewed from the street or adjoining properties, requiring that the installation be screened with tall shrubbery. Some safety

---

**1.** I note in passing that the Supreme Court recently sustained the FCC's authority to issue regulations preempting local cable regulation enacted in the wake of the Cable Act's passage.

*New York v. FCC*, —— U.S. ——, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988). The Court did not directly consider the FCC *Order* in question, however.

purposes might also be achieved by preventing dish antenna roof placement and by establishing height limitations in order to avoid the hazards of a fallen or wind-blown antenna.

Finally, the Ordinance also must not prevent or impose unreasonable limitations on reception or impose costs on the user disproportionate to his total investment in antenna equipment and installation. In order to make this evaluation I must first digress to consider how satellite television signals are received. I draw this explanation from the undisputed affidavit submitted by plaintiffs' TVRO vendor and installer, the article submitted by defendant, Harry B. Roth, Regulating Satellite Dish Antennas, American Planning Association, Planning Advisory Service Report No. 394, and the discussion accompanying the release of the FCC Order at 51 Fed.Reg. 5519 (1986) et seq.

Nineteen satellites in geostationary orbit 22,300 miles above the equator broadcast programming services that can be received only by TVRO antennas. These "television satellites" are located above the eastern Pacific and are spaced four degrees apart from each other. The TVRO remains in a fixed position to receive signals from a given satellite but is mounted on an electric rotor that permits it to be realigned to receive signals from the other satellites as required.

In order for the TVRO antenna to receive satellite signals, there must be a clear line of sight between the satellite and the dish antenna. Dense obstructions such as buildings, trees and shrubbery interfere with or prohibit reception. The range of unobstructed positions an antenna must have to "view" the satellites and receive signals is called a "reception window" or "look angle". This angle is expressed in terms of two dimensions. The azimuth alignment, expressed in degrees from true North, refers to the horizontal direction the antenna must be directed. Since there are a number of television satellites, this is expressed as a range. The elevation alignment refers to the vertical orientation, usually expressed in degrees above the horizon. In northern New Jersey, a look angle with an azimuth alignment of 69 to 143 degrees West and an elevation alignment of 14 degrees above the horizon is required to receive signals from the television satellites.

Because satellite-transmitted television signals are relatively weak, the dish antennas must be at least ten feet in length in this area of the country in order to receive transmissions.

 Plaintiffs do not claim that a rear-lot installation would completely preclude all satellite reception; they claim, rather, that they can receive "all" of the available signals only by mounting the dish antenna on the roof of their house. The FCC Order does not require the Ordinance to permit optimal placement; it precludes only "unreasonable" interference with satellite signal reception. It is unclear whether plaintiffs inability to receive "all" of the satellite signals includes channels which are encrypted or which the plaintiffs are not otherwise authorized to receive. Construing all facts in the light most favorable to the party opposing summary judgment, I cannot conclude, on the basis of this assertion alone, that the regulation imposes an unreasonable burden on plaintiffs.

It is clear, however, that the Ordinance functions as an unreasonable burden on reception because its provisions make reception technically impossible and because it is generally insensitive to the unique conditions that govern signal reception on any given site.

Although defendant does not dispute that a ten-foot wide dish antenna is the smallest size capable of receiving television satellite reception in this area, the Ordinance makes reception technically impossible by limiting the maximum height of any part of the antenna installation to six feet. A ten-foot wide dish antenna angled at the required fourteen degree elevation, would clearly exceed this limitation.

The Ordinance is also insensitive to the unique conditions that govern reception on any given lot. The Ordinance requires the antenna to be "screened from view from adjoining properties and streets by ever-

green planting ... at least six feet in height at the time of planting." Ordinance sec. 3.1. This standard is unreasonable because it is insensitive to the impact of shielding on an antenna's reception window. While vegetation surrounding a satellite installation can actually help improve reception by absorbing interfering signals, it can impair or limit reception if it obstructs the antenna's line of sight. If the orientation of a specific lot requires a look angle directed toward a rear-adjoining lot, for example, the antenna would have to be placed over ten feet behind the required six-foot high evergreen screening, assuming a fourteen degree elevation azimuth, in order to gain a clear "view" over the obstacle. Given the configuration of some lots, this might well limit or completely prevent reception. This type of regulation was specifically disapproved by the FCC in the statements accompanying its Order. 51 Fed.Reg. 5519, 5524 (1986) ("[An ordinance] cannot unreasonably limit or prevent reception by requiring, for example, that a receive-only antenna be screened so that line of sight is obscured.").

In addition, if there were lots on either side of the rear yard, the TVRO user would also have to shield the antenna from view by the adjoining properties by planting evergreen shielding on both sides. Thus, a homeowner might have to plant thirty feet of hedgerows six feet tall to comply with the ordinance at a cost that could easily exceed the initial investment in satellite television reception equipment.

The Ordinance also unreasonably restricts reception by failing to provide options for alternative placement to TVRO users who cannot receive signals or who would receive only diminished reception through rear lot installation. While roof-mounting poses obvious aesthetic and safety problems, a per se prohibition of roof installations, especially where the community interests in appearance and safety can be satisfied at least in part, is an unreasonable limitation on reception within the meaning of the Order.

■ Defendant's proposed solution to the antenna height limitation, which it concedes to be an unreasonable limitation of reception, is to allow TVRO users who cannot achieve reception within the constraints imposed by the Ordinance to apply to the Board of Adjustment for a zoning variance. (This would presumably also be its response to the other unreasonable limitations I have found the statute imposes upon reception). The defendant claims that this scheme would effectively enable the Board to apply the Ordinance in an individualized manner.

This scheme is unsatisfactory for several reasons. First, while the concept of individualized treatment may be a worthy one, variances from this Ordinance do not provide an effective means of achieving this objective. A variance from a zoning ordinance is permitted only if "without substantial detriment to the public good" and if it "will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. sec. 40:55D–70. Apart from the very real question of whether any variance from the challenged Ordinance would remain consistent with its specific purposes, this scheme is objectionable because it does not include reasonable satellite television signal reception as a factor in the evaluation but considers only the purposes of the ordinance and the "public good".

Second, permitting the Board effectively to regulate TVRO antenna placement by granting variances from an invalidated ordinance would allow the Board to exercise authority without bounds. No standards for antenna placement would exist to guide the decisions of the Board, to apprise TVRO users of permitted placement sites, or to provide a meaningful standard for review of the Board's decisions. Nor could the Board be guided directly by the FCC Order since it was intended as a standard for the preemption of local regulation, not a model zoning ordinance. Permitting the Board to regulate TVRO use in this manner would also increase the likelihood of judicial intervention in a traditionally local function, something that I would think that the defendant would be loathe to encourage.

Finally, the variance procedure, requiring TVRO antenna users to make an application for hearing, publish notice, serve notice of publication and make a presentation at a public meeting, imposes burdens other antenna users are not required to bear and is therefore discriminatory within the meaning of the Order. Since the process is not governed by consistent, objective standards, this variance process would represent an unreasonable limitation on reception.

I am not unsympathetic to the difficult task faced by municipalities that seek to regulate dish antenna use in balancing the community's aesthetic and safety interests with the individual's interest in receiving information transmitted through satellite television signals. The FCC, however, has determined that when the community and individual interests conflict in this context, the interests of the individual and the national interest require that the balance be tipped in favor of permitting individual satellite television reception. The task of fashioning appropriate legislation in light of this mandate is not a simple one, but municipalities can enact regulation consistent with the Order by regulating the use of all antennas evenhandedly, without imposing special burdens on TVRO dish antenna users, or by ensuring that their regulations do not make reception technically impossible and are flexible enough to account for the unique reception requirements of the individual lots within their boundaries.

*Conclusion*

For the reasons above, I conclude that, assuming that the FCC had authority to issue the Order, the Maplewood Ordinance is preempted by 47 CFR 25.201. I thus need not reach plaintiffs' constitutional claims.

If the FCC Order is valid plaintiffs would be entitled to summary judgment declaring the Ordinance invalid, enjoining its enforcement and awarding plaintiffs attorney's fees pursuant to 42 U.S.C. sec. 1988. It would follow that defendant's motion to dismiss the preemption claim and for failure to apply for a variance should be denied on the merits and that defendant's

motion to dismiss Counts 2 and 3 should be dismissed as moot.

However, defendant challenges the validity of the FCC Order, an issue I do not have jurisdiction to decide. If within 45 days of October 11, 1988 defendant commences a proceeding challenging the *Order* before the FCC and thereafter actively prosecutes the proceeding, and if defendant stays prosecution of plaintiffs and enforcement of the Ordinance against them, I shall defer entering summary judgment against defendant at this time and shall stay proceedings in this case until final disposition of the proceeding challenging the validity of the FCC Order. Otherwise summary judgment will be entered as described above. Defendant should advise me by October 31, 1988 what course of action it proposes to take.

### APPENDIX

### MAPLEWOOD DISH ANTENNAE ZONING ORDINANCE

There is hereby adopted an ordinance regulating the construction, placement, and use of dish antennae within the Township of Maplewood and supplementing and amending the zoning ordinance of the Township of Maplewood regarding Accessory Building and Structures.

### SECTION 1. ACCESSORY BUILDINGS AND STRUCTURES

Section 1.1: An accessory building attached to a principal building is considered part of the principal building and shall adhere to the yard requirements for the principal building.

Section 1.2: The distance from an accessory building to a principal building shall not be less than 10 feet nor less than 6 feet from another accessory building or a property line.

Section 1.3: The distance from an accessory building to a side property line shall not be less than the side yard requirements of the principal building.

### SECTION 2. DISH ANTENNAE

Section 2.1: A receiving dish antennae (or satellite receiving station) shall be considered an accessory structure.

Section 2.2: A receiving dish antennae shall be no more than 6 feet in height measured at the highest point of its outer circumference or any extension, including the supporting structure. It shall be located in the rear yard only. On corner lots, which have no defined rear yard, it shall be located in a side yard a minimum of two times the required front setback from the street line measured at its closest point on its circumference, at any extension or to its supporting structure, whichever is closest.

Section 2.3: A transmitting dish antennae is not a permitted use.

SECTION 3. BUFFERS FOR DISH ANTENNAE

Section 3.1 A dish antennae [sic] shall be screened from view from adjoining properties and streets by evergreen planting, which shall be at least six feet in height at the time of planting.